UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE


UNITED STATES OF AMERICA      )
                                  )      No. 2:05-CR-107
V.                                    )      District Judge Greer
                                    )      Magistrate Judge Inman
DAVID EDWARD MOORE        )


REPORT AND RECOMMENDATION


Defendant is indicted for possession of marijuana, a Class A misdemeanor, and

for possession of an open container of alcohol in a vehicle, a Class B misdemeanor.

He has filed a Motion to Suppress[1] all evidence underlying these charges, specifically,

a partially consumed bottle of whiskey, a quantity of marijuana, and defendant's

statement regarding that marijuana. The motion has been referred to the United States

Magistrate Judge under the standing orders of this Court and pursuant to 28 U.S.C. §

636(b). An evidentiary hearing was held on March 10, 2006.

Three witnesses testified: National Forest Service ("NFS") Officer Jason Crisp,

NFS Officer Scott Cairnes, and the defendant. The recitation of facts which follow are

those found by the preponderance of the evidence by the Magistrate Judge. Inasmuch

as a transcript of the testimony will be prepared in the event an objection is filed of this

Report and Recommendation, there will be no extensive paraphrase or summarization

---

[1]Doc. 17.

of a witness's testimony except where deemed necessary.[2]

## FACTS

On December 3, 2005, the NFS set up a vehicle compliance checkpoint, i.e., a

roadblock, on NFS Road No. 188, also known as Briar Creek Road, in a portion of the

Cherokee National Forest in Washington County. Defendant does not contest that this

checkpoint was duly authorized and operated appropriately. The checkpoint was

manned by four officers: NFS Officer Crisp, NFS Officer Cairnes, NSF Officer Kim

Coleman, and an unnamed officer with the Tennessee Wildlife Resources Agency.

Briar Creek Road is a narrow graveled road in the mountains. It was a chilly

day, and misting rain. The primary purpose of the roadblock was to check compliance

with vehicle laws. Another purpose of the roadblock, albeit of secondary importance,

was to check compliance with hunting laws and regulations, since it was bear hunting

---

[2]Crisp and Cairnes were extremely credible witnesses. And, it must be acknowledged, the defendant also appeared to be trying to be candid with the Court. Nevertheless, there were inconsistencies and they must be resolved by the Court.

Two or more people observing or hearing the same event likely will perceive it differently. Were they preoccupied with something else? Was the event deemed so relatively unimportant at the time to one witness that he did not pay as close attention as another?

As for the inconsistencies between Crisp and Cairnes (e.g., the place on defendant's body where Crisp commenced the pat-down), the inconsistencies are trivial and in no way compromise the credibility of either officer. As for the inconsistencies between the defendant on the one hand, and Crisp and Cairnes on the other, defendant was both nervous to the point of agitation (most likely because he knew he was in a perilous position), and at least to some extent he was under the influence of alcohol. Thus, all inconsistencies are resolved in favor of the officers. In other words, the Court believed the officers.

season in that portion of the national forest.

At approximately 5:00 p.m., defendant was driving his Ford pickup truck on Briar Creek Road. Riding with him was John Wilson. Both men had been drinking, and a partially-consumed bottle of whiskey was on the truck seat between them. As defendant rounded a curve, he saw the officers' vehicles with blue lights flashing some distance ahead. Defendant slowed his truck almost to a stop and pulled to the side of the road. All this was observed by Officers Crisp[3] and Cairnes. Both officers waved at defendant to drive on up to the checkpoint, which defendant did, albeit very slowly.

Defendant testified that he slowed and pulled over as he did because he believed that there had been a car wreck. The officers, however, noted defendant's actions with some suspicion, since drivers who are in violation of some law, e.g., driving on a revoked driver's license or intoxicated, naturally would prefer to avoid roadblocks.[4]

When defendant arrived at the roadblock and stopped, Officer Crisp approached the driver's side, and Cairnes went to the passenger side. Crisp asked defendant for his driver's license, and he immediately detected the odor of alcohol. Crisp asked

---

[3]Officer Crisp is stationed in North Carolina at the present time. On December 3, 2005, he was a "trainee" and assigned to this area of Tennessee for training purposes. Although a trainee as far as the NFS was concerned, Crisp was no neophyte. He commenced his employment in March 2004, and before that he was a deputy sheriff in North Carolina. It is again noted that Officer Crisp was an extremely credible witness.

[4]In fact, defendant himself testified that he had consumed alcohol, that Wilson was "pretty drunk," that he was concerned about the bottle of whiskey in the car, and that he told Wilson to cover up the bottle of whiskey with a shirt or jacket.

3

defendant if there was "anything I need to know," and he noted that defendant was extremely nervous and that his eyes were red and "glossy." It was apparent to Crisp that defendant was under the influence of alcohol to some extent, and he suspected that defendant was driving while impaired, an offense under Tennessee law.

As defendant handed over his driver's license to Crisp, he remarked that he was not hunting. Crisp responded that he was not interested in checking for hunting violations, and he again asked defendant if there was anything he (Crisp) needed to know.

While Crisp was engaged in this conversation with defendant, Officer Cairnes was dealing with the passenger, John Wilson. Although defendant was arguably "impaired" by alcohol, Wilson was drunk. On the seat between defendant and Wilson was the article of clothing, either a shirt or light jacket, referred to in footnote 4. Cairnes could see the neck of a whisky bottle protruding from beneath the garment, and he told Wilson to move the jacket. When Wilson did so, a half-empty bottle of Jim Beam whiskey was revealed, which of course Crisp also was able to see.

Crisp ordered defendant to get out of the truck so that he could pursue his investigation of the potential alcohol offenses – driving while impaired and possession of an open container. Defendant was wearing a leather jacket; as he exited the truck, Crisp saw a bulge in the left coat pocket. Crisp asked defendant if he had any weapons, and defendant answered that he did not. Defendant was still extremely

4

nervous, and his hands were visibly shaking. Crisp testified that he almost always

conducts a pat-down search for weapons during a DUI stop since intoxicated drivers are

"unpredictable." Therefore, he asked defendant if he could search his person for

weapons, and defendant's first answer was incomprehensible. Crisp repeated the

question, and said he needed a "yes" or "no." Defendant answered "yes."[5] Crisp then

asked defendant to turn around and place his hands on the truck. Defendant did not

react except to fidget and squirm nervously. Crisp testified that defendant's nervous

mannerisms, coupled with his passive noncompliance, worried him. Cairnes testified

that he, too, was concerned; besides acting nervously, defendant appeared as if he

could not understand Crisp's instructions to turn around; defendant simply stood still.

Cairnes testified that such actions sometimes are a prelude to running or fighting.

Finally, Crisp put his hand on defendant's shoulder to essentially guide him in turning

around. Crisp told defendant that he was going to handcuff him for everyone's safety

but that he was not under arrest. Indeed, Crisp told defendant two separate times that

he was not under arrest.

   After defendant was facing the truck and handcuffed, Crisp began his pat-down

frisk.[6] As Crisp patted the coat pocket, he pressed with enough force to compress the

---

[5]Defendant does not dispute that he consented.

[6]According to Crisp, he started his pat-down at the bulge in defendant's coat pocket, i.e., more or less at waist level. Cairnes testified that Crisp started the frisk at defendant's armpits, and worked down toward the waist. This is one of those inconsistencies referenced in Footnote 2. The inconsistency is trivial and in no way compromises the credibility of either Cairnes or Crisp.

bulge in the jacket. The "bulge" was soft and, to use Crisp's word, it "collapsed." Crisp testified that it was obvious to him, based upon his experience and training, that it was a bag or pouch of marijuana.

Crisp testified that he believed he had probable cause to reach into defendant's pocket and remove the bag. However, he did not do so, because he was reluctant to "stick his hands where he couldn't see." He then related that only two weeks earlier, a Carter County deputy had reached into a suspect's pocket and was stuck with a needle. Therefore, Crisp asked defendant, "what is that?" Crisp said that he asked the question only once, and that defendant answered, "that would be marijuana." Defendant testified that Crisp asked him, "what is that?", to which he answered, "not a weapon." According to defendant, Crisp asked his question two more times before defendant finally answered, "that would be marijuana." Although this factual dispute is resolved in Crisp's favor, it really is not of critical importance.

After defendant acknowledged that his pocket contained marijuana, Crisp reached in and removed a plastic sandwich bag roughly half full of marijuana.

It is undisputed the defendant was never given *Miranda*[7] warnings.

## LEGAL ISSUES PRESENTED

1. Was this a valid temporary investigative detention under *Terry v. Ohio*, 392

_____

[7]*Miranda v. Arizona*, 384 U.S. 436 (1966).

U.S. 1 (1968)?

2. If it was a valid temporary investigative detention, was a pat-down frisk of defendant's person allowable under the Fourth Amendment?

3. At any time, did the temporary detention metamorphosis into an arrest, thereby mandating *Miranda* warnings before any questioning regarding the nature of the bulge in defendant's pocket?

## CONCLUSIONS

This entire episode had its genesis in an obvious moving vehicle violation. When defendant stopped at the roadblock, he reasonably appeared to be under the influence of alcohol to some extent; his passenger was clearly intoxicated; the odor of alcohol emanated from the car; and a bottle of whiskey, only partially covered by a shirt, was sitting on the seat between defendant and his passenger.[8] At that point, it was appropriate for Officer Crisp to order defendant to get out of the vehicle so that Crisp could further investigate whether or not an alcohol-related driving offense had occurred.

When defendant exited his truck, Crisp noted the bulge in his coat pocket. Crisp testified that he customarily pats down drivers who are suspected of committing alcohol-related driving offenses because they tend to be "unpredictable." Perhaps some

---

[8]Although defendant's motion seeks to exclude *all* evidence, the bottle of whiskey is not mentioned in defendant's brief. In any event, a portion of the bottle was in plain view, and there is no basis to exclude it from evidence. *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996).

legal scholars and judges sitting in the safe confines of their offices might opine that a precautionary pat-down of an individual who is only suspected of drunk driving is too intrusive under the Fourth Amendment; other judges and scholars might agree that intoxicated individuals indeed can be unpredictable and a pat-down search is nothing more than commonsensical precaution.  That issue does not have to be reached here. Crisp asked defendant if he could search his person for weapons, and defendant consented.[9]

At this point, this clearly was a temporary investigative detention under *Terry v. Ohio*.  As such, no *Miranda* warnings were required.  But when defendant was placed in handcuffs, did the encounter evolve into a custodial arrest, thereby bringing *Miranda* into play?

The use of handcuffs during a search will not necessary convert a *Terry* stop into a custodial arrest.  "During a *Terry* stop, officers may draw their weapons or use handcuffs 'so long as circumstances warrant the precaution,' (citation omitted)." *Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 309 (6th Cir. 2005).  The key words in the foregoing citation are, of course, "so long as circumstances warrant the precaution."  Crisp only handcuffed defendant subsequent to defendant's weird behavior.  Recalling that defendant had been drinking, and recalling further that he was extremely agitated and acting as if he could not comprehend Crisp's directive to turn

---

[9]Although a significant portion of defendant's brief was devoted to the lack of a necessity for a pat-down under these circumstances, defendant freely admitted that he consented to the search.

around for the search, handcuffing him was prudent for all concerned.  As Officer

Cairnes testified, that kind of behavior often is a precursor to running or fighting.

Running would have been an aggravation; fighting would have been far more serious.

Placing the handcuffs on defendant while the pat-down search was accomplished was a

simple precaution for the safety of both the officers and defendant.  Therefore,

circumstances certainly warranted the use of handcuffs, and their use did not convert

the temporary detention into a custodial arrest, *Radvansky, supra.*

Obviously defendant was not free to leave; indeed, a temporary investigative

detention under *Terry v. Ohio* presupposes that a suspect is not free to leave. But, so

long as the detention remains within the parameters of a *Terry* detention and has not

evolved into a custodial arrest, *Miranda* warnings are not required.  "The very nature

of a *Terry* stop means that a detainee is not free to leave during the investigation, yet is

not entitled to *Miranda* rights."  *United States v. Swanson*, 341 F.3d 524, 529 (6th Cir.

2004) [citing *Berkemer v. McCarty*, 468 U.S. 420 (1984)].  Since no *Miranda* warnings

were required, there were no constitutional violations attendant to Crisp's inquiry to

defendant regarding the bulge in his coat pocket.[10]

It is respectfully recommended that defendant's Motion to Suppress be DENIED.

---

[10]As an aside, this Magistrate Judge finds that Crisp had probable cause to believe that,
after the pat-down, the bulge in defendant's pocket was a pouch of marijuana.  He flatly
testified that based on his experience, it likely was a bag of marijuana.  Therefore, he could
have seized it without further ado. *See, United States v. Proctor*, 148 F.3d 39, 42-43 (1st Cir.
1998).

Any objections to this report and recommendation must be filed within ten (l0) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1)(B) and (C). *United States v. Walters*, 638 F.2d 947-950 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985). The objecting party shall procure and file simultaneously with the objections a transcript of any testimony before the Magistrate Judge. If a transcript is not filed simultaneously with the objections, the party filing the objections shall either (1) file a declaration that the transcript was ordered before the objections were filed and the date on which the party expects the transcript to be filed, or (2) affirmatively state that a transcript of the testimony presented to the Magistrate Judge is not needed for resolution of the objections. If a party files objections to this report and recommenda-tion, the attorney for that party shall provide a copy of such objections to the opposing counsel on the same day the objections are filed, either by hand-delivery or facsimile transmission. The opposing counsel shall file his/her response to the objections within five business days of the date the objections are filed.

Respectfully submitted,


    s/ Dennis H. Inman
United States Magistrate Judge